UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:05-CR-43 |
| | ) | |
| KEVIN L. HICKS | ) | |

## OPINION AND ORDER

This matter is before the court on Defendant Kevin L. Hicks's ("Hicks") motion to suppress. Hicks originally filed a motion to suppress on October 18, 2005, which the court denied on February 22, 2006. On April 11, 2006, Hicks filed a motion to reconsider the order, which the court granted, reopening the motion to suppress to consider new evidence. The court held an evidentiary hearing on July 17, 2006, and took the matter under advisement awaiting briefs from the parties.

Hicks filed his "Second Memorandum in Support of Motion to Suppress" on September 1, 2006, with the Government filing its "Post-Hearing Opposition to Defendant's Motion to Suppress" on October 2, 2006. Hicks then replied on October 19, 2006. For the following reasons, Hicks's motion to suppress will be denied.

## FACTUAL BACKGROUND

Following his arrest on July 5, 2005, Hicks was charged in a single count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The present motion relates to Hicks's July 5 encounter with the police and his subsequent arrest, with Hicks contending that new evidence reveals that police officers had no legal basis to stop him and therefore violated his Fourth Amendment rights.

After Hicks filed his original motion to suppress, the court held an evidentiary hearing on December 19, 2005, where both parties stipulated to the following facts:[1]

On July 5, 2005, at approximately 12:05 a.m., Officer David Tinsley of the Fort Wayne Police Department was dispatched to the residence at 4033 Buell in Fort Wayne, Indiana, in reference to a "domestic disturbance with a party armed with a gun." As Officer Tinsley approached the residence from the north, he noticed a black male, later identified as Hicks, wearing all black and walking away from the residence. According to Officer Tinsley, upon observing Hicks he contacted dispatch, who advised him that the perpetrator of the domestic disturbance–a black male wearing a black shirt and black pants–had just left 4033 Buell.

Officer Tinsley approached Hicks with his gun drawn in the "low ready" position and shined a light on Hicks. When Officer Tinsley ordered Hicks to keep his hands visible and approach him, Hicks told an individual nearby, "Man, Dave, why'd you do me like this?" and then walked towards the side door of a residence. Although Officer Tinsley again ordered Hicks to stop and approach him, Hicks just looked at Officer Tinsley and continued walking towards the door.

By this time, Sergeant Lapp had arrived, and he ordered Hicks not to approach the residence and to comply with Officer Tinsley's orders. Hicks responded by entering the residence. Officer Tinsley then ran towards Hicks, ordering him to stop, and Hicks turned to look at Officer Tinsley through the door. Officer Tinsley ordered Hicks to exit the house, and when Hicks did not move, Officer Tinsley opened the door, pulling Hicks out of the residence.

Officer Tinsley then handcuffed Hicks for officer safety. As Officer Tinsley was about to

---

[1] These facts were taken from Officer Tinsley's incident report.

start a pat down search of Hicks, Hicks informed the officer that he had a gun in his right front pants pocket. Officer Tinsley reached into Hicks's pocket and removed a fully loaded handgun. Hicks was then placed in a squad car. After the records bureau informed Officer Tinsley that Hicks was a known convicted felon, Officer Tinsley told Hicks that he was being arrested for being a convicted felon in possession of a handgun.

Based on these facts, the court denied Hicks's original motion to suppress; however, Hicks now asks the court to reconsider this ruling based on newly discovered evidence, namely the 911 telephone call that precipitated Officer Tinsley's dispatch to 4033 Buell. Although the Government did not oppose Hicks's motion to reconsider, it asked the court to also consider the police dispatch tape regarding this incident. At the July 17, 2006, evidentiary hearing, the following evidence regarding the 911 call was offered for the court's consideration:

At around midnight on July 5, 2005, Chris Delagrange ("Delagrange"), an employee of the City of Fort Wayne's Emergency Communications Department, received a 911 call reporting that Kevin Rowles[2] ("Kevin") was beating up Cynthia Broadnax ("Broadnax"). Although the caller initially reported that Kevin had a gun, when Delagrange later asked the caller to confirm this information, he replied, "I'm thinking," and then stated that Kevin did not display the gun to him.[3] (Tr. of 911 Call 3.) Delagrange also asked the caller twice what his name was; the first time he replied, "Albert C," and the second time he told Delagrange that his name was David Woodberry. (Tr. of 911 Call 2-3.) In addition, the caller initially indicated that he was calling from his cell phone, but moments later told Delagrange that he was calling from his home phone.

---

[2] Ostensibly, the caller was referring to the Defendant, Kevin Hicks.

[3] Towards the end of the call, Hicks met up with the caller at about the same time that Officer Tinsley arrived at the scene. When Delagrange asked if Hicks still had the gun, the caller replied that he did not.

3

Finally, Delagrange inquired, "[W]hat color shirt do you have on just so [the police] know it's you when [they] approach?" (Tr. of 911 Call 4.) The caller replied that he was wearing a black shirt and that he was a black male, but did not provide a description of Kevin.[4]

Delagrange relayed some of the information she received from the caller to Duane Waterman ("Waterman"), an employee of Fort Wayne 911, who eventually dispatched Officer Tinsley to 4033 Buell. The following is a transcript of the relevant portions of Waterman's dispatch:

> Soundtrack 1
>
> Dispatch: Send a squadron out (inaudible) the medics are getting ready to come through
>
> Dispatch: John 373, John 377 - 40662, 4th on the 4033 Buell Drive, 4-0-3-3 Buell, Kevin Ross and Cynthia Broadnax; Kevin 62 with a gun, John 373
>
> * * *
>
> Soundtrack 2
>
> Dispatch: He is a male black wearing a black shirt, unsure if he left.[5]
>
> Officer: (inaudible) He just went east-bound on Branning
>
> Dispatch: Eastbound on Branning

(Tr. of CD of Radio Traffic 1.)

Sylvia McClendon ("McClendon"), who ostensibly is the woman the caller referred to as

---

[4] Delagrange testified at the evidentiary hearing that she did not know whether the caller was giving reliable information and that although she was able to identify the telephone number of the caller, she was unable to verify the caller's address.

[5] Although Waterman testified that he did not remember giving Officer Tinsley a description of the clothing worn by Hicks, he believed that he gave the description of the caller provided by Delagrange.

Broadnax, testified that she did not speak with Officer Tinsley before his encounter with Hicks, nor did she complain to anyone about Hicks's behavior on July 5.[6]

## DISCUSSION

While the Fourth Amendment protects "against unreasonable searches and seizures," U.S. Const. amend. IV, it does not prevent all encounters between police and citizens. A police-citizen encounter is categorized as either a voluntary encounter, investigatory stop, or arrest. *United States v. Johnson*, 910 F.3d 1506, 1508 (7th Cir. 1990). An investigatory stop is considered a Fourth Amendment "seizure," during which an officer may briefly stop and frisk an individual if the officer has "specific and articuable facts sufficient to give rise to a reasonable suspicion" that the individual "has committed or is about to commit a crime." *Id.* (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975); *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

In the order denying Hicks's initial motion to suppress, the court found that Officer Tinsley had reasonable suspicion to conduct an investigatory stop of Hicks, specifically noting that "[a]t the very moment that Officer Tinsley observed Hicks walking away from the residence at 4033 Buell, dispatch indicated that the perpetrator of the domestic disturbance, who matched the description of Hicks, was leaving the residence." (Feb. 22, 2006, Op. and Order 5.) Hicks now argues that the 911 call and the subsequent dispatch are clear evidence that Officer Tinsley did not have reasonable suspicion to stop him. Specifically, Hicks points out that the 911 caller

---

[6] Hicks also testified at the hearing, stating that upon his arrival at David Woodberry's house on July 5, he found his ex-girlfriend, McClendon, inside, and the two of them argued. Hicks testified that before he left the house, he picked up a gun on the table and put it in his pocket. As Hicks exited the house, he noticed a police officer down the street, but this did not concern him because he felt that nothing happened inside the house that would cause the police to be called. Hicks admitted that when Officer Tinsley approached, he did not heed the officer's commands but instead walked into someone else's home. Finally, Hicks testified that he was wearing a black "sweat jacket" that evening.

5

gave a description of himself, not a description of Hicks. Accordingly, Hicks believes that Officer Tinsley's statement that *the perpetrator* was described by dispatch as a black male wearing a black shirt and black pants was entirely wrong. Hicks concludes that because Officer Tinsley was not provided with a description of the perpetrator, the officer did not have reasonable suspicion to stop him.[7]

Contrary to Hicks's contentions, the 911 call and dispatch have little effect on the court's original conclusion that Officer Tinsley had reasonable suspicion to stop Hicks. To determine whether reasonable suspicion exists, a court examines "the totality of the circumstances *known to the police* at the time of the stop . . . ." *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) (citing *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir. 1996)) (emphasis added). The dispatch transcript first indicates that a man named Kevin was armed with a gun, then later indicates that "he" was wearing a black shirt. There is no mention of the 911 caller in the dispatch tape. Officer Tinsley, therefore, reasonably concluded that the description pertained to the only male mentioned by the dispatcher, who was the armed perpetrator.[8]

Hicks also attacks the reliability of the 911 caller, arguing that the caller changed his story regarding his name and where he was calling from, that Delagrange knew nothing about

---

[7] In addition, Hicks rehashes a number of arguments raised in his first briefing. For example, Hicks argues that Officer Tinsley did nothing to determine his identity before the encounter, that Officer Tinsley had no indication that he was engaging in any criminal activity, and that Hicks's walking away from Officer Tinsley did not give rise to reasonable suspicion. Because these arguments were addressed in the court's first order and are not based on the new evidence, the court does not need to address them again here. *United States v. Bouzanis*, No. 00 CR 1065, 2004 WL 2065051, at *1 (N.D. Ill. Aug. 30, 1994) (citing *Caisse Nationale Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996); *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987)) ("A motion for reconsideration . . . serves the limited function to correct manifest errors of law or fact or to present newly discovered evidence.").

[8] Even if the dispatcher was mistaken and meant to describe the caller, a mistake of fact does not invalidate an investigatory stop if the officer is unaware of the mistake and is reasonable in acting upon it. *See United States v. Ornelas-Ledesma*, 16 F.3d 714, 718 (7th Cir. 1994), *vacated on other grounds*, 517 U.S. 690 (1996).

the caller's reliability, and that the caller was virtually anonymous. Furthermore, Hicks argues that Officer Tinsley should have checked into the credibility of the caller's information by speaking to McClendon before approaching Hicks. In that regard, the Seventh Circuit's recent decision in *United States v. Drake*, 456 F.3d 771, 774-75 (7th Cir. 2006), is instructive. There, the Court held that an eyewitness's 911 call reporting an ongoing emergency was presumed reliable for purposes of establishing reasonable suspicion.[9] *Id.* ("[W]e recognize the particular duty of police officers to speedily respond to emergency situations reported by individuals through the 911 system. . . . Requiring further indicia of reliability would only jeopardize the usefulness of the 911 system and the ability of officers to prevent further danger to the public.").

Here, the 911 caller was reporting an ongoing emergency–a domestic dispute in which the perpetrator was armed with a gun–and therefore Officer Tinsley was entitled to presume that the caller's information was reliable without further corroboration.[10] Furthermore, there is no indication that Officer Tinsley was aware of the caller's inconsistent information, particularly since there was no mention of the caller in the dispatch. *See Lenoir*, 318 F.3d at 729. Accordingly, Officer Tinsley was entitled to rely on the dispatch report as reliable information that an ongoing emergency was occurring at 4033 Buell.

---

[9] While the Seventh Circuit made specific mention of the fact that the caller identified herself to the 911 operator, the Court seemingly does not suggest that its decision would have been different if the caller had not revealed her identity. *See id.* at 775. ("We therefore presume the reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion, particularly when the caller identifies herself.") Indeed, when reaching its decision, the Court noted that "[e]ven in the case of anonymous callers, two of our sister circuits have afforded eyewitness 911 reports of ongoing emergency situations the same treatment." *Id.* (citing *Anthony v. City of New York*, 339 F.3d 129, 136-37 (2d Cir. 2003); *United States v. Holloway*, 290 F.3d 1331, 1338-39 (11th Cir. 2002)).

[10] Hicks argues that by the time Officer Tinsley arrived on the scene, the caller had informed Delagrange that Hicks had calmed down, and the emergency, therefore, had subsided. The dispatch transcript, however, does not indicate that this information was relayed to Officer Tinsley. Indeed, the caller provided this information to Delagrange almost simultaneous to Officer Tinsley's arrival on the scene.

## **CONCLUSION**

Based on the foregoing, Hicks's Motion to Suppress is DENIED.

Entered: This 6th day of November, 2006.

s/ William C. Lee, Judge
United States District Court
Northern District of Indiana
